IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RAFAEL ABURTO,

    Petitioner,                    No. CIV S-06-2446 MCE GGH P

  vs.

ROSANNE CAMPBELL, et al.,

    Respondents.              FINDINGS AND RECOMMENDATIONS

                           /

I. Introduction

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2002 conviction for 20 counts of committing a lewd and lascivious act on a child under the age of fourteen (Cal. Penal Code § 288(b)(1)) and four counts of digitally penetrating a child more than ten years his junior (Cal. Penal Code § 269(a)(5)). Petitioner is serving four consecutive indeterminate life terms of 15 years to life plus 120 years.

        The petition raises three claims: 1) jury misconduct; 2) ineffective assistance of counsel; and 3) denial of right to jury trial. After carefully considering the record, the court recommends that the petition be denied.

/////

1

II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

When reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).  As to each claim, this court will discuss which state court opinion is entitled to AEDPA deference.

III.  Factual Background

The opinion of the California Court of Appeal contains a factual summary of petitioner's offense.  After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

The victim was defendant's stepdaughter (Victim), age 11 when the abuse began. The parties stipulated Victim was under the age of 14 and defendant was more than 10 years older than Victim at the time of each alleged offenses.

Victim lived with defendant for eight years. Defendant and his wife (Mother) had been together since Victim was four years old. Mother had another son, M. (age 11 at the time of trial) before she met defendant, and defendant had a son, I. (age nine at the time of trial). Together, Mother and defendant had a daughter, P. (age seven and a half at the time of trial), and another son, M.A. (age five at the time of trial).

The family lived in a two-story house with defendant's grandmother and his cousin. Defendant and Mother shared their bedroom with M.A; Victim and P. shared a room; and M. and I. shared a room. Victim acknowledged she had always been afraid of defendant, and never liked him and blamed him for the break-up of her parents' marriage. Victim hoped defendant and Mother would split up.

Defendant often asked the children to massage him on school days and the weekend. Beginning in July 2000, defendant began touching Victim's "private parts."

Beginning in September 2000, both Mother and defendant worked during the day, and defendant's grandmother took care of the children after school.

The first incident occurred while defendant, Victim, and I. were watching a movie in the family room downstairs and Mother was upstairs. At the time of the first incident, Victim was afraid of defendant because she had seen him beating and kicking her brothers.

The next incident occurred in the boys' bedroom while Mother was in the shower and the boys were playing video games in the same room. During a massage, defendant pulled down the waistband of Victim's pants and touched her "private parts,"

The next molestation was in October when defendant again wanted a massage while he and several children were watching a leprechaun movie in the family room. Victim said another incident occurred before her 12th birthday.

Defendant would not permit Victim and P. to close the door to their room. On one occasion, defendant crawled into Victim's bed but Victim locked her legs and feet and resisted defendant's efforts to get under the blanket with her. On another occasion, defendant crawled in bed with her and tried to remove the blanket.

Victim described a number of instances of digital penetration. In one, Victim was in her parents' bedroom watching television while her siblings were in her brother's room. While she massaged defendant, he put his hands under her pajamas.

Defendant also touched her with his penis. In one incident, defendant penetrated her from behind after pulling her down onto her side on his bed. Defendant's

4

penis moved like a "heart" and she felt "wet stuff," which she later learned was sperm.

On another occasion, defendant came into her bed and put his fingers inside her and then put his penis inside her. Victim testified defendant touched her more than 10 times between September 2000 and her 12th birthday. Before her 12th birthday, defendant put his fingers inside her more than 15 times and put his penis inside her more than 15 times. After Victim turned 12, she testified defendant put his fingers inside her more than 15 times and felt his penis more than 15 times.

In October 2001, Victim told her friend what had happened. When she came home from school, defendant cursed at her and threw her across the hall because she had done a bad job cleaning her mother's bathroom. That day, defendant digitally penetrated her.

The next day, Victim told another friend what had happened, who encouraged Victim to tell a teacher. The teacher spoke to Victim and a counselor called protective services and the police.

Victim was examined at the Child Abuse Evaluation and Examination Center at UC Davis. Colposcopic photographs were taken. Dr. Angela Rosas, a child abuse specialist, reviewed the colposcopic photographs of Victim's vaginal area. Dr. Rosas discovered a hymenal tear and a cleft, consistent with penetrating injuries to the vagina.

Victim and her siblings, M., M.A., and P. were interviewed at the Multiple Disciplinary Interview Center (MDIC). M. Said defendant hit him with a belt and beat I. Victim testified she did not tell the interviewer all the facts.

About a week later Mother moved her children to San Jose. Victim began counseling. Victim falsely told the therapist she could not remember the molestation, but later told another therapist about it.

M. testified he gave massages to his stepfather, as did I. and Victim. M. testified defendant beat him, struck him with a belt and kicked him the back. M. saw Victim give defendant massages in the family room, the living room, and the parents' bedroom. Once defendant would not let him in the bedroom with them.

P. saw Victim, I., and M. massage defendant. Once defendant would not let her into his bedroom when Victim was inside. P. also saw defendant getting into Victim's bed, but he told her to go back to sleep.

Mother acknowledged that M. and I. gave defendant massages, but did not recall Victim massaging him.

<u>The Defense Case</u>

Defendant denied any improper contacts with Victim. He admitted spanking the children and hitting M. and I. with a belt. He admitted asking for massages from the children. Defendant and Mother discussed separating. They argued about her belief he was having an affair the day before he was arrested.

5

> Dr. Joyce Adams, a sexual assault expert, concluded it was impossible to tell from the colposcopic photographs whether Victim had been sexually abused.
>
> Defendant's grandmother testified she saw nothing improper between defendant and Victim, denied being told by M. defendant was touching Victim in an improper way, and admitted M. and I. told her defendant was hitting them with a belt.
>
> I. testified that defendant took Victim into closed rooms on several occasions, but he never saw defendant touch Victim in a bad way. Defendant did spank him and hit him with a belt.

Respondent's Lodged Document no. 5, pp. 2-6.

IV. <u>Discussion</u>

    A. <u>Juror Misconduct</u>

The California Court of Appeal was the last state court to issue a reasoned decision addressing this claim. <u>See</u> Respondent's Lodged Documents Nos. 5, 7. Accordingly, the court considers whether the denial of this claim by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority.

Petitioner argues that a juror committed misconduct during jury deliberations when she stated that her brother had been molested without anyone in the house knowing about it. The background to this claim is summarized in the opinion of the California Court of Appeal:

> Defendant filed a motion for new trial based on affidavits from two jurors, Jurors Nos. 11 and 5. The affidavits stated that Juror No. 1, during discussion about whether molestation could occur without being seen by other children or adults in the house, stated that her brother had been molested without anyone else in the house knowing about it. The People countered with another affidavit from Juror No. 5, and affidavits from Juror No. 10, Juror No. 12, and Juror No. 1.
>
> In evaluating the affidavits, the trial court first found that, with the exception of a comment by Juror No. 6 included in Juror No. 5's affidavit, the affidavits were admissible.
>
> The trial court found that no misconduct occurred because Juror No. 1's comments were a reflection of life experience. Further, even if this was misconduct, there was no possible prejudice because the comments were solely directed to the incidents of molestation that occurred while others were in the room.

Respondent's Lodged Document no. 5, pp. 6-7.

/////

"A court examining a claim of a juror's improper use of extrinsic evidence must determine whether the particular materials that a juror allegedly brought into the jury room are, in fact, improper extrinsic materials, or are merely 'the kind of common knowledge which most jurors are presumed to possess.'" U.S v. Hayat, 2007 WL 1454280 * 10 (E.D.Cal. 2007), quoting Rodriguez v. Marshall, 125 F.3d 739, 745 (9th Cir. 1997), overruled on other grounds by Payton v. Woodford, 299 F.3d 815 (9th Cir. 2002), U.S. v. Bagnariol, 665 F.2d 877, 888 (9th Cir. 1981) (discounting claim of prejudice where extraneous information was something that "any reasonable juror already knew").

Segregating life's experiences from extrinsic evidence is a difficult task with even the Circuit courts going one way and then the other.

"Jurors are permitted to utilize their life experience and common knowledge during deliberations." Id., citing Hard v. Burlington N.R.R. Co., 870 F.2d 1454, 1462 (9th Cir. 1989); Grotemeyer v. Hickman, 393 F.3d 871, 878, 879 (9th Cir. 2004) ("The mere fact that the jury foreman brought her outside experience [as a medical doctor] to bear on the case [did not] violate Grotemeyer's constitutional right to confrontation...That a physician is on the jury does not deprive a defendant of his constitutional right to an impartial jury, even though the physician will doubtless have knowledge and experience bearing on any medical questions that may arise."). "Many trials, including this one, boil down to a question of who is lying. It is hard to know who is lying without some understanding, based on past personal experience, of the circumstances of the witnesses." Grotemeyer, 393 F.3d at 879. Importantly, "We have said in obiter dicta, and now hold, that '*a juror's past personal experiences may be an appropriate part of the jury's deliberations.*' (FN18 omitted) Indeed, '50% of the jurors' time [is] spent discussing personal experiences,' " according to one researcher." Id. (Emphasis added).[1]

---

[1] In Grotemeyer the physician had utilized her education and medical experiences in opining that the defendant's mental illness had caused him to commit the crime and that he would receive treatment if in prison.

1       However, in Estrada v. Scribner, 512 F.3d 1227 (9th Cir. 2008), the court held that the personal experience of a juror discussed with the jury – the prior murder of a family member – was juror misconduct. The past experience had evidently been discussed in terms of whether the defendant should eventually be subject to a harsh(er) sentence.

The undersigned does not see much substantive difference in the allegations against each respective juror. In this case, the juror in question discussed her past experience with respect to the ability of sexual abuse to go unnoticed by other family members in the house. Whether one's past experiences stem from education and work, or from a particular family event, does not seem distinctive to the undersigned. Perhaps in Estrada the court felt as it did because the court found extrinsic conduct was also discussed on a matter not germane to the jury's liability determinations. In any event, the situation involving the petitioner at bar is more similar to Grotemeyer than Estrada.

Based on the standards set forth above, this court finds that Juror No. 1's statements regarding her brother concerned her own life experience and not inadmissible extraneous information. See also Hard v. Burlington N.R.R. Co., 870 F.2d 1454, 1462 (9th Cir. 2004) (juror's arguments during deliberations based on his prior military experience interpreting x-rays did not constitute improper extraneous information). For this reason, the court finds that no jury misconduct occurred.

The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

B.  Ineffective Assistance of Counsel

*Standards for Ineffective Assistance of Counsel*

The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of

reasonableness. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. To this end, the petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. Id. at 690, 104 S. Ct. at 2066. The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id., 104 S. Ct. at 2066. "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice. Strickland, 466 U.S. at 693, 104 S. Ct. at 2067. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id., 104 S. Ct. at 2068.

In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a fundamental fairness standard. Williams v. Taylor, 529 U.S. 362, 391-93, 120 S. Ct. 1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

The Supreme Court has recently emphasized the importance of giving deference to trial counsel's decisions, especially in the AEDPA context:

> In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052. Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).
>
> For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it

is not enough to convince a federal habeas court that, in its
independent judgment, the state-court decision applied <u>Strickland</u>
incorrectly.  See <u>Williams</u>, <u>supra</u>, at 411, 65 S. Ct. 363.  Rather, he
must show that the [ ]Court of Appeals applied <u>Strickland</u> to the
facts of his case in an objectively unreasonable manner.

<u>Bell v. Cone</u>, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

*Analysis*

The California Court of Appeal was the last state court to issue a reasoned decision addressing this claim.  <u>See</u> Respondent's Lodged Documents Nos. 5, 7.  Accordingly, the court considers whether the denial of this claim by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority.

Petitioner argues that his counsel was ineffective for failing to object to the use of evidence of physical force used by petitioner beyond the limited scope permitted in a pretrial motion.  The California Court of Appeal denied this claim for the following reasons:

> Before trial, the prosecution sought a ruling permitting introduction of evidence that Victim had observed and heard defendant beat M. and I., which was relevant to her mental state and explained why she would not resist defendant or run away from him.  The prosecutor stated he would not introduce evidence from the brothers themselves that they were beaten at any other times, and would agree to a limiting instruction.  By ruling that the evidence was more probative than prejudicial, the court permitted introduction of this limited testimony over defendant's objection.  Victim then testified that defendant hit I. and M. with a belt.
>
> Nevertheless, without objection, the prosecution elicited evidence from defendant's stepson M. that he had been beaten by a belt and that I. was beaten by a belt.  P. testified she saw defendant beat both M. and I. with a belt and hit and kick I. while he was on the ground.
>
> The trial court gave a special limiting instruction after Victim's testimony: "Ladies and gentlemen, before we start the testimony this morning, I do want to read to you an instruction that you need to keep in mind.  Evidence has been received through [Victim] regarding observations or knowledge of abuse or discipline of her siblings.  This evidence may not be considered as to any bad character of the defendant, and may only be considered as to the effect it may have had in [Victim's] mind in regards to the elements and allegations of force, fear, menace and/or duress."
>
> And, as part of its general instructions, the trial court gave both a limiting instruction agreed to by the parties, as well as special instruction on defendant's use of corporal punishment.  The trial court instructed: "Certain evidence was

10

admitted for a limited purpose. At the time this evidence was admitted you were instructed that you could not consider it for any purpose other than the limited purpose for which it was admitted. Do not consider this evidence for any purpose except the limited purpose for which it was admitted. [¶] Evidence has been received regarding allegations of abuse or discipline of the children in this case. This evidence may not be considered as to the [e]ffect it may have had in [Victim's] mind in regards to the elements and allegations of force, fear, menace and/or duress. [¶] It is lawful for a parent reasonably to discipline a child, and in doing so to administer reasonable punishment, including the infliction of reasonable corporal punishment. However, it is unlawful for a parent to inflict unjustifiable punishment upon a child. Corporal punishment is not justified and is therefore unlawful if the punishment was not reasonably necessary, or was excessive, under the circumstances. [¶] You may only consider evidence of the discipline of the children for the limited purpose of the [e]ffect it may have had in [Victim's] mind in regards to the elements and allegation of force, fear, menace and/or duress."

In order to prevail on an ineffective assistance of counsel claim, defendant must show both "(1) that defense counsel's performance fell below an objective standards of reasonableness, i.e. that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.]" People v. Cunningham (2001) 25 Cal.4th 926, 1003.) We evaluate the reasonableness of a trial counsel's performance and decision-making "'in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation...'" [Citation.]" (People v. Hart (1999) 20 Cal.4th 546, 623-624.)

Trial counsel did not object to the evidence, and the record does not reveal why he did not do so. Arguably, an objection would have been futile since once Victim testified to what she saw, the boys simply corroborated that the events she reported happened in fact. In any event, assuming trial counsel could have successfully objected to testimony about defendant's beatings, we do not find the error prejudicial. The general limiting instruction was even broader than that offered after Victim's own testimony. The parties agreed not only to general limiting instructions, but limitations on allegations of abuse and the discipline of the children. In his closing argument, defense counsel emphasized the limiting instruction. He reminded the jury the evidence could be considered only as to the effect upon Victim's mind concerning force, fear, menace and duress. We assume the jury followed the cautionary instructions. (People v. Boyette (2002) 29 Cal.4th 381, 436.)

Further, the record demonstrates that defense counsel deliberately elicited some of this testimony, even from his own witnesses. Defendant admitted hitting his sons with a belt. Defendant's grandmother testified the boys told her defendant hit them with a belt. Victim saw bruises on I. I. said defendant struck him with a belt. Hence, there was no dispute between the parties that defendant used physical force on his sons and stepsons, including a belt. The only dispute was whether

11

1 | Victim was influenced by these beatings.
2 | The record does not demonstrate ineffective assistance of counsel.
3 Respondent's Lodged Document no. 5, pp. 11-15.
4 | For the reasons found by the California Court of Appeal, the court finds that
5 counsel's failure to object was not prejudicial so that the outcome of the trial would have been
6 different had counsel objected. The testimony of the boys simply corroborated the victim's
7 testimony. Petitioner himself admitted that he beat his sons. Petitioner's mother testified that the
8 boys told her that petitioner beat them. In addition, the jury was given cautionary instructions
9 regarding this testimony.
10 | The denial of this claim by the California Court of Appeal was not an
11 unreasonable application of clearly established Supreme Court authority. Accordingly, this claim
12 should be denied.
13 | C. <u>Denial of Right to Jury Trial</u>
14 | Petitioner argues that pursuant to <u>Blakely v. Washington</u>, 542 U.S. 296, 303-04,
15 124 S.Ct. 2531 (2004) the imposition of consecutive sentences based on facts that were not found
16 by the jury nor admitted by him violated his Sixth Amendment right to have a jury determine
17 those factors.
18 | Petitioner raised this claim in habeas corpus petitions filed in state court. The
19 Sacramento County Superior Court denied a related claim citing <u>In re Dixon</u>, 41 Cal.2d 756, 759
20 (1953) on grounds that it should have been raised on appeal. Respondent's Lodged Document
21 No. 8. The California Court of Appeal and California Supreme Court denied the petitions raising
22 this claim without comment or citation. Respondent's Lodged Documents Nos. 9, 10.
23 | To put petitioner's claim in context, the court will set forth the following legal
24 background. In <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348 (2000), the Supreme
25 Court held that any fact that increases the penalty for a crime beyond the prescribed statutory
26 maximum must be submitted to a jury and proved beyond a reasonable doubt. In <u>Blakely v.</u>

Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), the Supreme Court explained that "the statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 542 U.S. at 303, 124 S. Ct. at 2537.

In Cunningham v. California, 127 S. Ct. 856 (Jan. 22, 2007) the Supreme Court, citing Apprendi and Blakely, held that California's Determinate Sentencing Law violates a defendant's right to a jury trial to the extent it permits a trial court to impose an upper term based on facts found by the court rather than by a jury.

The Ninth Circuit has found that Apprendi is not implicated by the decision to run sentences consecutively in the context of the federal guidelines when the sentences did not violate Apprendi in their own right. United States v. Buckland, 289 F.3d 558, 570-72 (9th Cir. 2002).

Even if Blakely were applicable to sentencing for multiple offenses petitioner would still not be entitled to relief. Blakely requires jury determination of all facts necessary to support sentencing beyond the statutory maximum. When, as here, a defendant is sentenced to an indeterminate term, the statutory maximum is life in prison. Additional consecutive sentences serve only to increase the statutory minimum sentence, which the Supreme Court has held does not implicate the Sixth Amendment. See McMillan v. Pennsylvania, 477 U.S. 79, 82, 106 S.Ct. 2411 (1986).

After conducting an AEDPA review, the court finds that petitioner's Sixth Amendment claim is without merit. Accordingly, petitioner is not entitled to habeas relief as to this claim.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 03/18/08

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

aburto.157